Good morning. Juliette Boyd on behalf of the appellants. Mark and Lisa Becker, thank you. Good morning, your honors. Barry Kessler on behalf of the appellants. I believe counsel is counsel for the appellates. Good morning. We have a lot of 30 minutes to hear this case. It's the only case on the docket so if we go past that guideline, no foul, no harm, no foul. You may reserve the appellant may reserve a few minutes for rebuttal if they so choose and with that we can go forward. The time will be equally divided, that half hour. Is that 30 minutes per side? No, 30 minutes, I'm sorry, it's going to be equally divided. So each side has 15 minutes. If you want to reserve 5 minutes, you go ahead and go 10 minutes to start off with. Then since I'm the appellant, if I could reserve 4 or 5 minutes for the rebuttal, then I'll use that. Absolutely, absolutely. And before you guys start, just a couple of things. This is an unusual case because there's many situations where the judge does not rule. He broke the case up over a period of time which is a no-no and in some cases he ruled inconsistently. So I would like you to point out especially where he ruled inconsistently, especially in the disclosure act, he was all over the board. So with that in mind, proceed. May it please the court, counsel. Typically in a residential real estate closing, the contract does not contain warranties that survive the closing. So to address that problem a number of years ago, real estate brokers started to have their clients get inspections. The unfortunate problem with an inspection is that does not indicate any latent defects. So as you're aware, the Illinois General Assembly, in order to provide additional relief, adopted the Residential Real Estate Disclosure Act. And in that act, they allowed that the representations in the act would survive the closing for a period of one year with a very restricted limitation period of one year. So you need to, we want to distinguish, and I tried to in the briefs, between express undertakings in a real estate or any contract where when you have express undertakings, there is a 10-year statute of limitations in the event of a breach of those express undertakings. With respect to the representations in the Disclosure Act, those are not representations that are, those are not express undertakings in the written contract. Those only get incorporated into the contract through incorporation. And it's our position that when you incorporate the Disclosure Act into the contract, which is fine, you also have to incorporate into that the limitation period of one year. In this case, the plaintiff's action was brought solely based upon incorporation of representations in the Disclosure Act into the contract. And it's our position that when you incorporate those, that's fine, but you still only have one year within which to maintain your cause of action as to those representations. It doesn't affect the 10-year limitation on any express undertakings in the contract. When the Court did make a ruling on the summary judgment motion, there was a finding about what did not relate back. Can you tell us what your understanding and your position is on what the judge was ordering when he made those statements? We filed a motion to dismiss on limitation grounds in connection with the areas on the east side of the house, which were not originally filed until 17 months after the closing. And those pertain to Spalding Stone, which you'll see in the court order. It had to do with the windows, and we believe it had to do with any of the leaks on the terrace, which was all not part of the original contract. So in the motion to dismiss that was filed several months prior to trial. The Court dismissed that area of the house pertaining as to the Disclosure Act representations. So it's the defendant's position in this case that having dismissed those at that time, the Court made express findings. The findings were, number one, those were separate areas of the house that had not been pled in the original pleadings and were not pled for the first time until after 17 months after the closing, which was after the expiration of the limitation period. And plaintiffs argued that that should relate back, and the Court, after reviewing it and after hearing the arguments and the briefs, found that that did not relate back. So at that juncture, the plaintiffs had three options. Number one, they could seek an interlocutory appeal. Number two, they could re-plead the complaint or ask for leave to re-plead. Or three, they could appeal the Court's orders and bring the matter to the appellate court. Plaintiff did none of those, and there is no cross-appeal filed by the plaintiffs with respect to those findings. But you had later the judge let them back in. The judge apparently let those in as to count one, the contract count, because the judge ---- After he dismissed count two of the other actions. Yes. The judge felt that they were ---- Of the prior complaint. Excuse me. No, I said of the first complaint he dismissed, and then subsequently he lets it back in. No, it was actually ---- Consistent with ---- The motion was filed as to the fourth amended complaint. Right. Count one was the contract count. Count two was the disclosure count. Okay. And he dismissed those allegations in count two as to the whole east end of the house. But he did leave them back in when he allowed evidence under count one for the breach of contract. And that was over our objection. We raised the objection at trial that, look, you've already dismissed that. There's nothing left to incorporate in terms of count one as to those areas you've dismissed. We weren't arguing as to the foundation wall, and we weren't arguing as to the upper roof, because those areas were properly pled at the initial complaint and were filed within one year of the closing. We filed the motion only as to those new areas of the house. He agreed on count two, the disclosure count, but then he allowed evidence in on count one. And I believe even in his order that he entered, he found that the disclosure act gets incorporated into the contract count. So that was his justification. We've argued that that was error, that he should have ---- Now, was that the March 4th order? That was the ---- Well, the March 4th was the motion to dismiss those allegations from count two. Okay. Were there at trial, and is this your position, the defendant's position, were there at trial any damages that were properly able to be considered by the trial court, given the fact that at the end of the one-year period of statute of limitations, when that passed, the only complaints were the roof and the foundation, both of which were disclosed in the inspection report? It was our position that the case should have proceeded on those two elements of damages, the foundation wall and the upper roof. And the evidence showed that there were certain out-of-pocket expenses that the plaintiffs had paid for repair of the upper roof, as well as some water damage that had occurred in the interior stemming from that leak. There was the expert report that the plaintiffs submitted as to the foundation wall, we objected to and asked that that be stricken, because that didn't pertain to the proper measure of damages, which we believe the law is clear. The measure of damages is the cost to repair. It is not replaced with new. And the And in terms of the damages that were actually introduced into evidence, not estimates, but how much money did they spend to fix something that they claim was They were remaining items. They spent, the evidence showed they spent total $28,000 in cash, of which portions of that related to personal property replacement, which the judge in his opinion said they weren't allowed to recover. We're not here to talk about washers and dryers, okay? Right. What I'm asking is what was put into evidence that the buyers had spent to fix problems that they say were not properly disclosed to them? They spent no money on the foundation wall, and they spent, as I said, about $300,000 to repair the upper roof. They spent about $11,000 or $10,000 weeks later to totally tear it off and replace it, and I believe the evidence showed expenditures of maybe $10,000 roughly, because we didn't get the breakdown, about $10,000 to replace some damaged walls on the interior from the original leak when the water rushed down the walls. So they did do some drywall work. They did do some flooring work, and I think that was less than $10,000. So the total that they expended, aside from washers and dryers and stuff like that, was $300,000 for the roof, the $11,000 later to totally replace an 11-year-old roof, and whatever amounts they spent on the interior walls. Are you arguing then that the award by the court should be remitted to that amount of money? Absolutely. We're not conceding that they've ever given a proper damage case as to the foundation, because the evidence was that you could excavate in the area of the leak, repair the wall, repair the drain tile if it was bad, and that would be a few thousand dollars. The plaintiff's estimate was $28,000 to dig an entirely new drain tile system all the way around the house, even though they never dropped a camera down just to see if there was a problem. So the evidence that was admitted was replacement costs as to the foundation. We believe that was inappropriate. So they shouldn't allow anything for the foundation because there was no proper evidence submitted as to the foundation wall. Why should there be anything for the roof or the foundation if, let's assume that there's no argument that the seller had some notice from the prior deal that went sideways, that there were problems with the roof of the foundation, and then the buyer comes in and they have an inspector go out and he says, you've got problems with the roof, you've got problems with the foundation, there's water penetration here, there's water penetration there, why should there be any damages whatsoever if there's a one or two week delay in telling them what they ultimately learned? Well, my clients aren't going to like this, but my view of the law after my 35 years, Your Honor, is that the Disclosure Act is the Disclosure Act, it is the law, and if it's a false representation that's made and that's what the judge found, then they should allow some recovery for that roof. If it's fraud, the answer is no. They had an inspection report, the inspection report disclosed the problems, that's not fraud. But the fact that the Illinois General Assembly enacted a special act that covers this that says if you make a false representation, recovery is allowed, then I'm not going to stand before this Court and say, no, they knew about it, they don't get anything. I mean, to me, that's just not fair, that's not right. So I've never argued in this case that they shouldn't recover anything for the upper roof, and we've never argued that they shouldn't recover something for the damage to the interior walls when the flood came in. What we have argued, though, which was a fact question that it doesn't matter before this Court, but the inspection of the roof prior to the closing revealed that there was some minor leaks somewhere, but no specific area. But there wasn't anything that said the roof had a major issue. And what happened when they brought in their roofing repair contractor to go up after the leak is he said the rolled roofing had opened up. Well, it's a 10-year-old roof, Your Honor, and that opening in the rolled roofing wasn't there at the time of the inspection. That's something that fortuitously occurred, and obviously at a terrible time. But the amount of water that the plaintiffs have described have come in, and I don't deny what they're saying. It was a lot of water. That didn't come through some minor leak. That came through where the seams on this rolled roofing actually bubbled and opened and the water rushed through. That didn't exist at the time of the closing, and it didn't exist at the inspection because their inspector crawled all over the roof and inspected it. And his statements as to the roof were that the problems were by the flashings over on the edge, not in the middle of the roof. But to directly answer your question, based on the trial court's finding, I think some award for the roof is in order. What is wrong with the attorney fee award? Well, the attorney, well, Your Honor, this is a case that started with an issue with the roof, which was a minor damage, okay? And anything that went wrong with this house for the next four years, the plaintiffs brought into this action through amended complaints. They sought $500,000 in compensatory damages, and they were seeking punitive damages of the same amount. They blew this case way out of proportion. If you're really looking at the prevailing party in this case, Your Honor, I believe the defendants were the prevailing party, if this court reverses as we believe it should. If the plaintiff's damage in this case amounts to a defective roof, and they're awarded $300 or $5,000 or whatever, it shouldn't be awarded $200-some-thousand in legal fees for a matter that should never have gone this far. We believe it was inappropriate to bring into this case all these matters that pertain to things that go wrong with a house. I mean, we all know that when you buy a house that's got a 100-year-old foundation and is not a new house, things will go wrong. But that doesn't mean that after the closing, because you have one that you might be able to tag onto, that every conceivable problem with this house over the next four years is suddenly a defendant's problem and they should pay for it. If you look at Dixon's testimony when he went through, he was their expert engineer. He looked at the windows in his first walkthrough, and he said, there's a little, nothing wrong with the windows, but on the woodwork around it, there's some water leaks that you should repair. Plaintiffs did no repairs. And as a result, when he came back a year and a half to two years later, he found that because of the moisture that had been allowed to drip on this for these two years, that those seals had now warped and the windows needed to be replaced. That's not a defendant issue. That's a plaintiff's problem. There was no mold in this house at the time of the closing, and the plaintiffs did nothing to industrially dry out in some fashion. We all go out when you've got a water problem and you get those big dryers in and you blow the place dry. Their own witness testified that you don't get mold without moisture, and yet the plaintiffs did nothing to correct that moisture infiltration problem for years. In fact, the evidence was clear, and I asked to reopen the evidence. They waited six years before they implemented the repairs, which constituted the bulk of the damages in this case. They waited until after Judge Barkowitz entered his order on June 15th. Then they mysteriously go out and repair the house for We asked that the evidence be reopened because at that point the final judgment had not been entered, and the whole issue in this case was what were the damages? What was really spent to repair that place? And the plaintiffs had the opportunity to repair over a six-year period. They didn't do it. It's not fortuitous that that house didn't get repaired until after the judge entered his order. Can you give me any idea how the judge came to the number he came to? Your Honor, it is impossible to come to that number without compromising damages. And it's impossible to come to that number without taking areas in the house for which no recovery is allowed to conglomerate that. There's no question in my mind that Judge Barkowitz was trying to do what he thought was the right thing in a King Solomon fashion. They're seeking a half a million dollars. They're saying it's not worth anything. I'm going to cut that baby somewhere. He did not give us any delineation of what the damages are, which is totally improper. And what was horrible that we thought was he allowed their expert witness to testify as to estimates that weren't estimates prepared in the ordinary course of business. These aren't estimates. This isn't like a doctor's report or hospital reports where a physician comes in later and says, based upon the whole record, these are what my thoughts are. These are estimates that were prepared solely for litigation, that were never used. No one ever did the work. And he allowed their expert, the architect, come in and testify that what was set forth in the estimate constituted a reasonable cost to do the estimate work. But the architect never looked into what work had to be done. The plaintiff's own mold expert testified that about 200 feet of drywall had to be repaired. 200 lineal feet. They brought in a guy that I don't want to talk about what I believe his capabilities are. They brought in a mold guy to say that 14,000 feet of drywall in this house had to be removed. And when I asked their expert architect, do you know if 14,000 feet have to be removed? He said, of course not. I just based this on the estimate that was put in front of me. That's clearly hearsay. And we objected to the testimony at the time. We moved to strike it at the end of the trial. And the judge allowed that in. We don't believe that you can bring in an expert witness to testify as to hearsay estimates that were solely prepared for litigation. These aren't documents prepared in the ordinary course of business. And with respect to which the expert doesn't testify as to his own knowledge. He just says that what they've listed in there, that's a reasonable dollar amount for the work they've specified. But I have no idea what work needs to be done on this house. We thought that was totally inappropriate. And that shouldn't have been allowed to be admitted into evidence. If you take away the testimony of Mr. Corrales, their architect, they have no damage case. They have the obligation to put on two aspects on a damage case. First, the proper measure of damages. And then the amount of damages. I don't dispute the amount of damages doesn't have to be accurate. I mean, that's up to the court to decide the amount. But they have to come in with at least a proper measure of damages. They have to stand before the court with witnesses that say, these are the repair costs for this property. Not all new. We're not putting in an entirely new facade for $175,000. We're not putting in an entirely new drain tile at $28,000. We're not putting in all new windows on the east and south side of this house. That's preposterous. And we believe that Judge Barkowitz erred when he allowed that kind of testimony in. The plaintiffs, in our view, did not put on a proper damage case. And under the law, Your Honor, I don't believe that's my obligation. I don't have to perfect their errors by putting on what we believe were proper repair costs when they haven't put on the proper evidence in their case in chief. And we knew for a long time they weren't going to do that because based upon the discovery, based upon the 213s, I saw right from day one they were only going to hit us with total replacement costs. So I knew there was no repair testimony going to be there. Okay, so they're entitled to what, arguably? Arguably, they get $300 for the roof. They get some for the damage to the interior walls, which could be $5,000 to $9,000. They get nothing for the foundation because they never repaired it and never proved what the cost was to repair it. So you're looking at total damages in this case of somewhere around $10,000 to $12,000. All right, thank you. Thank you. Ms. Boyd. Thank you. I hope you can hear me better. May it please the Court. Your Honors, I wish to address those points that you raised, Justice Smith, with regards to the consistency issue first, and that ties into some of the issues with regards to the relation back issues. I think that there is some confusion in this case that the appellants have with regards to the difference between claims and damages. In this case, after the closing, we filed a complaint alleging four causes of action, breach of contract, real property disclosure violation, fraud, and fraudulent concealment. That was based on, and the damages described in that complaint were that water was leaking through the roof, causing damages to the walls, ceilings, and floors. Later, that complaint was amended to further describe the damages. We described those as the greater specificity was that there was spalling brick and windows. Why is this important? Because they attempt to characterize the appellants that these damages are now new claims, and that these new claims were brought after the one-year statute of limitations from the real property disclosure. But weren't you aware of these damages and you didn't disclose them? I beg your pardon? Your own inspector told us what most of these damages were in the record. Certainly, Your Honor. And they weren't in your original complaint. If you would like me to describe, address that point now, I can do that. The issue with the complaint with the, actually, may I come back to that point, Your Honor, so I can complete the consistency point and then I will address the argument of the reasonable assurances and the inspection report because that's the second thing that I want to address. So what they're saying is the spalling brick and the windows are new claims. They're not. When we amended that complaint, we didn't add new claims. It was the same four claims. Well, what they're arguing is that perhaps the trial judge had the same understanding that they did, and that is that spalling brick and all that did constitute a new claim. And the judge made a ruling. He said it's out. And mistaken or not, there's no appeal from that ruling. And they're saying you're stuck with the ruling. And, Your Honor, to address that point and why the judge's ruling is consistent, because it appears, I think Your Honor said, it looks like he takes it out and then he puts it back in. But if you look at what he ultimately gave damages for, in his judgment, he lists and says these are the things I'm going to give you damages for. Spalling brick and windows are not included. They raised these issues in the post-trial motions. November 30th, I read the transcript yesterday, Judge Barkowitz stated to counsel three times, let me clarify, I did not give an award damages for spalling brick. What did he give it for? What did he give it for? Judge, general verdicts are allowed in Illinois. My understanding is as long as the damages are within the range required, that that should be upheld. What did he give it for? In the judgment ruling, he states that he provides it for, if you'll see on page four, he lists this out. And this is what he stated at that post-trial hearing. He said, I provided damages for the leaking that came in, the repair of the roofs, the repair of the basement, in order to correct those places where the water was penetrating. How much money for those two items? Certainly, Your Honor, we can't look at that and say to any sort of How much did you put into evidence? How much do you think the judge gave you for those? We put into evidence $450,000. Judge Barkowitz said For those, no, no, no, no. What? No, no. We've seen your request. Okay. We saw the judge's ruling. Right. What I'm asking you specifically is, if you can recall, and if you can't, I understand it's a big record. I'm not trying to unduly, you know, burn you here. But what did you request in damages for those specific items? And do you have an understanding, or can you direct us to anything in the record that would show us what the judge gave you for those specific problems? Well, Judge, there's no specific place where Judge Barkowitz says, For this line item, I give you X. And I don't think that he's required to do that by law. He's allowed to give this It leaves us guessing, though. Well, Judge, if we look at the case law, if it's within a range, and the judge provides Within a range of what, though? Well I mean, this is like talking about apples and oranges. I mean, between the two sides here, there is no consistency as to what the damages are. In realistic, what Judge Barkowitz did gives us, you know, damages. Well, the problem that we have, Your Honor, is, well, first of all, the issue that we have here is, and they're trying to argue this is a compromise of damages, that he cut the baby. That's not the case. Emily's ruling The baby should have been cut by another $150,000 to $175,000 damages more, because you put nothing in the record by law as to proper damages, and he ruled on nothing specific. Your Honor, we provided detailed expert testimony from our structural engineer, who went through and said, this is what's wrong with this house. The roof deck that was above that master bedroom had no flashing between the roof deck and the master bedroom. The judge found, and there was substantial testimony on this, we provided estimates with regards to what it was going to cost to take that roof off and what it was going to cost to remove that deck and to provide a proper roof there. How much money did your clients spend to fix this laundry list of horribles that you put into evidence that they were left with? It's $480,000. How much money was actually spent before they sold the house? The paid repairs. They hadn't sold the house, Your Honor. The paid repairs were $28,000 in this. How much? $28,000 were the paid repairs. They replaced $28,000. You asked for 400-some thousand, and the judge gives you $200,000 without specifying what it is. And to say again, Your Honor, if we look at It didn't include personal property. I'm sorry. No, no, that's good. Your Honor, it did not include the personal property because they did not replace those other things. The $28,000, my recollection of it, it was that there was the replacement of the roof, the roof over the main. There are two roofs in this house, the roof over the main property and then the roof over the penthouse, the deck, the roof that's under the deck. They completely had to replace the roof on the big main roof. They replaced that completely. The water that was penetrating has caused damage to the walls from all through all five floors of this house. They repaired and did that. They had to do some replacement or repairs with regards to that basement. They tried to waterproof the basement. But those were, when we brought the experts in, the problems were going to cost much more money to fix. They had to take that roof deck off. All right. So if the reasonable cost of repair, as estimated by your expert with the architect taking the work of the other people and saying that that's reasonable, if the reasonable cost is $480,000 and the actual amount expended by your clients was $28,000, then what we're talking about is that they actually spent only 5% of what the reasonable recoverable damages are? Your Honor, they were so – Seriously? Your Honor, until this case occurred and our expert went in and figured out what was wrong with the property, that took a while to figure out. Six years? Your Honor, and also it was going to require substantial money to fix that, that they were hoping to recover from this case and fix that house with. So that's one of the issues that we have. I also want to address and just make sure that we're consistent here, is that the judge never awarded damages for the spalling brick and for those windows. Not on any claim. That's why he was consistent. He said they don't come in, I don't award damages on any claim, and he stated that at the hearing. Justice Smith, I want to address the point that you raised with regards to the inspection report. If the inspector found an issue, let's look at what the inspector found. He found possible water leaking issues. That's what he found. What did the clients do? Mark and Lisa Becker asked the sellers for assurances. What did the contract tell them to do? Well, Your Honor. Provide written notice to the seller. Let me get to that. I'll absolutely get to that. What they did was they asked the seller, for example, with regards to the roofs. Counsel, I just have a simple question. I'm sorry to interrupt. What did the contract require them to do in the event that they had some kind of a complaint after the inspection? Plain and simple. What did it require them to do? To provide written notice. What did they do? Did they do that? Because at the time. Did they do that? No. Certainly not. Judge, they got an extension of the attorney review period. They extended it a couple of days. They asked during the property inspection, for example, with regards to the roof. It was a small area of paint blistering under an eave. They asked seller, is there an issue with leaking in this roof? Seller's agent calls seller and seller says, the roof has been repaired. At that problem, that eave, all that becomes is a small amount of $100 worth of damage. It is no longer an issue. There is no longer anything that is required notification under their contract because it's been resolved. It's a reasonable explanation. There at some point was a leak, but all leaks have been repaired. They asked for similar assurances with regards to the basement. Now, the trial court, sitting and hearing all 18 witnesses over 18 days here, listened and he found those things to be reasonable. And based on the amount of evidence in the record, that is not against the manifest rate of the evidence. Particularly in this case, these reasonable assurances were provided in the context of fraudulent concealment. There was evidence put into the record that two months prior to this inspection, there was substantial damages inside the house from water leaking. Those damages had been painted over and covered up prior to that inspection. The assurances in conjunction and in the context of that fraudulent concealment has been upheld numerous times and cannot be shown as being against the manifest rate of the evidence here. That's what they did. They got the assurances, those assurances the trial court found was reasonable, and he granted the judgment for fraud in this case. The issue of damages, I do want to address that issue a little bit more clearly. In Illinois, we are allowed general judgments. We don't require the court to come up with an itemized number down to the penny if the damages are shown to be existent. And that's what happened in this case. We provided numerous, our structural engineer went in, he said, this is where the water is coming from, this is what needs to be done to repair that. We had contractors come in and give us estimates to do those repairs, and that's what the basis of those repairs were for. The court then, as I said, if you look at page 4 in his ruling, and the argument in the post-trial motion, November 30, 2011, he goes through and he says he thought, the trial court thought, that there were some items of betterment. He also thought that, for example, some items were not attributable to the sellers. He discounted those off. If we look at the Mount Carmel case, they say that that is a thing that is appropriate to do, based on the fact that, in addition, in the post-trial motions, Mr. Kessler pointed out that he had given damages for the parapet wall, which had been excluded by a prior ruling. He took those out and allocated $15,000 for that. You can see that he is calculating. He's including certain elements, excluding other elements, and that is allowed. We don't require him to come up with an absolutely specific amount. Also, in this case, they chose not to produce any or put in any expert testimony with regards to damages. What does that do and why is that important? Do they have a burden to do that? Absolutely. They had an affirmative defense of mitigation of damages. And under the case law, they have to tell the court, if these damages are worse, it is worse for X amount of dollars so that the judge is in a position to do a set-off. In this case, they provided no evidence by any expert. They did, however, object repeatedly when you attempted to introduce the measure of damages through the architect with all of these other estimates. So the record is protected on that in terms of your damage request. With regards to the affirmative defenses, in this case, they did not obtain a ruling on any of the affirmative defenses, and I don't think that that's properly before the court. I believe that that is waived as well. With regards to the measure of damages issue, the court in this case used the correct measure of damages, which is the cost of repair. Again, in his judgment, he says, what should have been and what is provided is to repair the house, to repair the drywall, to repair the leaks, to repair the basement. He doesn't say, and counsel asserts a novel argument. He says, if you're going to replace a component to repair a house, say a new roof, as in this case, you don't get that is a replacement cost. He provides no case law in support of that argument. We are not asking and never have asked for the replacement cost of this $2 million house. But he argues that replacing a component is a replacement cost. It is not. And that's not what was awarded in this case. What was given was the amount of money for a repair. But if you have a house with a 100-year-old window and you put a brand-new window in, isn't that sort of a betterment? Judge Barkowitz did reduce some things based on betterment, but how are you going to repair the house if it was not disclosed that the roof leaked and then we had this situation? But we didn't get the full benefit of that. It should have been pro-racial benefit. I don't believe so, Your Honor, because under the law here, again, replacement is the replacement of a $2 million house. To repair a house, you might have to put on a new roof. That doesn't necessarily mean betterment, because in this situation, if they had known and it had been disclosed to them that this had a leaky roof and water coming into a master bedroom and the basement, the appellants, appellees, my clients, would not have bought this house. So they're entitled to, and what the court says and what the measure of damage is, is to repair the house. So what you requested was 20 percent of the total value of the $2 million home and damages, even north of 20 percent, having spent a little bit more than 1 percent in actual repairs. And, Your Honor, that means that we're not up to the cost of diminution? Twenty-one. Twenty-one. Absolutely. The damages in this case are serious. They're serious. That master bedroom, the roof of the master bedroom, there's substantial evidence in there that was so rotted that the structural beams above the master bedroom were rotting, and their expert agreed with our expert that it comprised the structural integrity of this house and had to be replaced. Their expert agreed with that. Those were substantial damages, and that's why. How long did it take them to rot? Apparently, according to the expert, over seven years. So at the time that the. . . So it was prior. Yes. Therefore, it was your. . . It was when you had the house. No, no, I'm not the. . . I wasn't the seller. I'm sorry. It took place during the six years. Your Honor, this manifested itself, the water that was coming through that, immediately after the sale in 2005. It didn't manifest itself seven years later. We included. . . Was that part of the $28,000? No, no. So that hasn't been fixed? No, that has not yet been fixed. I mean, at the time, whatever is in the evidence here for purposes of the trial, at the time of the trial, that had not been removed and replaced. It's pretty hard to figure out from reading the trial transcript exactly what was appropriately considered and what was inappropriately considered. So if you could tell us now, your understanding, what is comprised of the $28,000 that was actually repaired, that was introduced into the evidence of trial? I'll give you my best estimate. That's my idea. But as I said, I think the entire, first of all, the roof, a temporary patch had to be put on this roof. Then they replaced the entire roof. Was that like $11,000 or $12,000? I think it was closer to $15,000, my recollection was, and this is a rough estimate. But also inside, as I said, the water gushed all five down, all five levels. They had to go remove and replace drywall throughout the whole house there. And then in addition, the basement, there was patchwork that they did to try to deal with this basement leak that showed itself. So that was my, that's a rough estimate of what they used the money and that $28,000 was for. What happened again in this case is that they thought that, right, this is fixed. And what came out was that these were persistent leaks, things that came forward in the bedroom, that the soffit in the master bedroom would just keep on puffing up and breaking and they'd have to go in and scrape everything off. That's when we had the expert go in, open up the roof, and then we found the problem was that rotten LVL structural beam that was over that window that had been deteriorated over at least seven years. At that point, major expenses are required in this case. These are serious expenses. We have to take the roof deck off. We have to take, we have to, the experts testified that they were going to have to take the roof deck off, remove the roof, shore up the building so that they could replace that LVL header. These are serious damages. So that's, I hope that addresses that point, Your Honor. Yes, it does. Thank you. If there are any other questions that the Court may have. No, thank you very much. Thank you very much. I would respectfully ask that based on the arguments and based on the briefs, that Your Honors affirm the ruling of the trial courts. Thank you. Thank you. Mr. Kessler. Mr. Kessler. You have nothing to say? You're waiting for us to ask further? You know, I've lived with this case a long time. I have a lot to say, but I'm going to confine it to what counsel said. When you have a contract that says give us written notice of the problems and you're required to give us not only a written notice that you found problems, but you have to give us a copy of the inspection report. And there's no denial. And counsel stood before you and said they never gave that notice. If you give that notice to a seller of property that says, look, we've got all these problems with the house, then the seller knows one of two things. Either we adjust the purchase price or we kill this deal because we don't see that's the issues. Or the seller at least has a chance to go out and try to find out what the problems are and go ahead and fix them. But what we've got here is we have buyers that this was their dream house. That's what their testimony was. They didn't want to do anything that might screw up this deal. So they went ahead and closed even though they had a detailed inspection report that listed the problems and they never gave any notice to the sellers as to this whole list of problems that they knew about. They are barred. They waived the right, which is in bold letters in the contract. They waived the right to now complain later about these issues that they knew about. And had they raised all this at the proper time, we wouldn't be here today. There's plenty of waiver in this case. There's waiver by conduct. There's waiver by contract. There's waiver in the form of arguments that aren't made by either side in the briefs. My question on the damages here, if the buyers are told by their inspector, regardless of what the seller knows, that there are problems with the roof, there's problems with the foundation, there's water penetration up, there's water penetration down, and all of the damages that in whatever form that are offered at trial relate to water from here, water from there, if they don't comply with that paragraph 12, if they don't give the seller a chance to remedy, reduce the price or whatever, isn't everything waived? In my view, yes. They should get nothing. And we moved for a directed verdict at the close of the case in chief because we felt that. You've asked specific questions on the $28,000. And on page 11 of my brief, which is also in the record, I just took the damages from their exhibit and put it in. That $28,000 was composed of approximately $5,300 they sought for appliance repair, which the judge on one part of his order denied, but still included it in the $28,000 of damages. The roof was $9,148, so I've rounded that off at $10,000 for a brand-new roof. They spent $5,500 right after the initial problem to bring in a maintenance guy to repair the drywall, to do the patching and the spackling and sanding. He issued a lump sum bill, which is in the exhibit, for $5,500. Thereafter, they decided that they can just do anything that they want to this house and repair things in the house and do work around the house. And they issued 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12. They had 13 different invoices from their maintenance guy, which totaled about $8,000, that they included as what they said were damages for the problems. So if you really look at the upper roof, what you're talking about is the $5,500 for the original repair of the walls and the interior and approximately $9,500, rounded off to $10,000, for an entirely new roof. That's their total out of pocket. It's not the $28,000 that the judge awarded. We didn't argue a lot of that in the brief because, frankly, if we're talking a half a million dollars, I wasn't going to be arguing about pennies here. And I wanted to make sure that we spent the limited time we had in our brief hitting the big issues. That's the breakdown of the damages. I don't agree with counsel that you can have a general judgment. I don't believe that's what the law says in Illinois in a breach of contract action. There's no question that where both parties introduce varying experts to testify as to a certain repair cost, and because they have difference of opinion, there's a variance in what those amounts are. Clearly, the court can look at those and somewhere in that range come up with a judgment based upon his looking at all the experts as to a repair cost for a specific item. He can't take what he's trying to do here in five, six different areas of the house and just throw out a number that bears no relationship whatsoever to what any of the evidence was at trial. And if you look at his judgment, he says that the damages are awarded for the foundation, for the damaged drywall, mold remediation in the upper bedroom, master bedroom, and hallway. Well, number one, the total mold remediation in this case by their own expert was 200 feet. You're talking a couple thousand dollars. The individual that they brought in to take out 14,000 square feet of drywall, we respectfully state he wasn't a witness at trial, and it's obvious why they didn't call him at trial. But that bears no relationship. The rest of the numbers, if you add them up, come nowhere close. I mean, we're nowhere over $20,000, $30,000. So even the judge's statement as to what he awarded for damages comes nowhere near $190,000.  Thank you. Thank you, Your Honor. We enjoyed both sides' arguments and the briefs, and we'll let you know soon. This will be issued soon. Thank you.